## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TRACI A. ABERNATHY,**

      **Plaintiff,**

                            **Case No. 1:22-cv-624**

   **v.**

                            **JUDGE DOUGLAS R. COLE**

**TRIHEALTH G LLC, et al.,**

      **Defendants.**

### OPINION AND ORDER

Plaintiff Traci Abernathy claims that Defendants TriHealth G, LLC, and TriHealth, Inc. (collectively TriHealth), violated the Americans with Disabilities Act, as amended (ADA/ADAAA), and corresponding Ohio law when it allegedly terminated her for requesting an accommodation related to her asthma. Two of TriHealth's motions are currently before the Court—a motion for summary judgment and a motion to strike Abernathy's late-filed affidavit. For the reasons more fully discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** TriHealth's Motion for Summary Judgment (Doc. 23), and **GRANTS IN PART** and **DENIES IN PART** TriHealth's Motion to Strike Plaintiff's Declaration (Doc. 32).

### BACKGROUND

TriHealth hired Abernathy as a medical assistant on February 3, 2020. (Pl.'s Resp. to Proposed Undisputed Facts, Doc. 27-1, #630). Her role was to "room" patients, which involved discerning the reason for their visit and taking various vital signs, among other things. (*Id.* at #631). Because she was a medical assistant,

TriHealth assigned her to a physician who would delegate duties to her. (*Id.* at #630; Abernathy Dep., Doc. 19, #155). Any day that Abernathy's assigned physician was not working, her direct supervisor, Chrissie Conner, would assign Abernathy to another physician or nurse practitioner (NP). (Doc. 19, #156–57, 257; Conner Dep., Doc. 21, #415). Her assignments were generally posted on her schedule at least one week in advance, though Conner would provide scheduling updates each morning, as needed. (Doc. 19, #157–59, 189).

Before describing the series of events that gave rise to the claims at issue here, a little background on Abernathy is in order. Since childhood, she has suffered from episodic asthma, which tends to flare up when it is cold in the winter or with seasonal allergies. (*Id.* at #218). To control her asthma, she follows a specific diet and also takes medication and uses an inhaler as needed. (*Id.*). In addition to episodic asthma, Abernathy also has diabetes. (Doc. 26-1, #566). Abernathy's fiancé, Jonathon Kelly, likewise suffers from various conditions, including diabetes, congestive heart failure, and chronic obstructive pulmonary disease. (Doc. 19, #239–40).

Now to the events of January 14, 2021—the day that precipitated this lawsuit. Let's start with the agreed-upon facts. Abernathy's usually-assigned physician was out that day. (Doc. 19, #193; Doc. 21, #424). So Conner had assigned her to work with NP Carol Evans in the "Clinic," an area for treating patients with respiratory ailments potentially including Covid-19.[1] (Doc. 19, #187–88, 194–95; Doc. 21, #424;

---

[1] The record reveals some confusion about whether the "Clinic" in which Abernathy was assigned to work was TriHealth's "Covid Clinic" or "Respiratory Clinic." (Doc. 19, #181–84; Doc. 21, #368–75). The apparent confusion seemingly arises from TriHealth's decision at some point in time to rename the "Covid Clinic" the "Respiratory Clinic." (*Id.*). Because the

Doc. 27-1, #632). When she arrived at work, however, Abernathy did not report to the Clinic. She claims that, because of her and Kelly's health conditions, she could not work there without putting the two of them at unreasonable risk. (Compl., Doc. 2, #31). Instead of reporting to the Clinic, she went to TriHealth's triage area. (Doc. 19, #200; Doc. 21, #433).

Beyond that, Abernathy's and Conner's recounting of the events diverge, but the story goes something like this. Conner learned of Abernathy's absence from the Clinic either because NP Evans called Conner, (Doc. 21, #433), or because Abernathy paged her, (Doc. 19, #200). When Conner located Abernathy in TriHealth's triage area (where Abernathy was working), Conner invited Abernathy into Conner's office and notified Abernathy that she needed to report to NP Evans in the Clinic. (Doc. 19, #201, 241; Doc. 21, #433). Abernathy instead chose to gather her things, leave the building, and drive around the block. (Doc. 19, #201–02; Doc. 21, #434). She was gone for somewhere between five and fifteen minutes, during which time she says she was trying to reach Human Resources (HR) by phone. (Doc. 19, #202–03; Doc. 21, #434).

Abernathy then returned to TriHealth's building and reentered Conner's office. (Doc. 19, #204–05; Doc. 21, #434). At that point, the women had another exchange, which ultimately resulted in Abernathy leaving the building a second time. (Doc. 19, #204–05; Doc. 21, #435–36). Abernathy claims that Conner terminated her, (Doc. 19, #207); Conner claims that Abernathy resigned, (Doc. 21, #433–38). Either way, that was Abernathy's last day working at TriHealth. (Doc. 19, #159, 198).

---

precise name of the area Abernathy was assigned to work does not bear on the summary judgment analysis, the Court will simply refer to the "Clinic."

But the story doesn't end there. Abernathy first sent Conner a text that same day saying: "I have not terminated my position." (Doc. 19-4, #335). And then the next day, January 15, 2021, Abernathy sent another text to Conner. Somewhat strangely, given that she had either resigned or been terminated (depending on whom you believe) the day before, the text stated: "I won't be in today. Please use PTO for today. I will see you on Monday." (*Id.*). Abernathy also apparently submitted a letter from her physician to HR. The letter stated that, in her physician's professional opinion, Abernathy should be excused from working in the Clinic. (Doc. 19, #253–54; Doc. 2, #31).

In any event, after her employment at TriHealth ended—whether by way of termination or resignation—Abernathy applied for unemployment benefits through the Ohio Department of Job and Family Services. (Doc. 19, #236; Doc. 2, #32).

But that is not all she did. Unhappy with how her employment at TriHealth ended, Abernathy filed this suit, asserting various disability discrimination claims under the ADA/ADAAA and Ohio law. Specifically, she alleged disability discrimination (Count I), disability discrimination based on her association with Kelly (Count II), failure to accommodate (Count III), and retaliation (Count IV). (Doc. 2, #33–37). She seeks damages, equitable relief, pre- and post-judgment interest, attorney's fees, and punitive damages. (*Id.* at #37).

TriHealth has since moved for summary judgment on all four counts. (Doc. 23). Abernathy filed an opposition, (Doc. 27), accompanied by an affidavit, (Doc. 26), with TriHealth moving to strike the latter, (Doc. 32). TriHealth filed a reply in support of

4

its original summary judgment motion. (Doc. 33). The parties have since fully briefed the motion to strike, as well. (Docs. 35, 36). And Abernathy has also filed what she labels an "objection" to some of the documents accompanying TriHealth's reply, (Doc. 34), to which TriHealth responded, (Doc. 37), and Abernathy, in turn, replied, (Doc. 38). So as things stand, the motion for summary judgment and the related challenges to various evidentiary materials are all ripe for review.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

This Court does not have the responsibility to sua sponte search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n,*

78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). That burden instead falls upon the nonmoving party to "set forth specific facts" or evidence in dispute. *Anderson*, 477 U.S. at 250 (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In sum, in light of all the facts as to which TriHealth shows a lack of dispute, Abernathy must in turn present some remaining "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, this Court must view the evidence in the light most favorable to the nonmoving party—Abernathy. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Before the Court undertakes the summary judgment analysis, a little housekeeping is needed. Because determining whether to grant summary judgment turns on what evidence is properly in the record, the Court must first address TriHealth's objection to Abernathy's late-filed affidavit, as well as Abernathy's objections to certain exhibits and documents TriHealth filed in support of its motion

for summary judgment and its reply. Once the Court resolves what evidence it can consider, it will then turn to the summary judgment analysis.

## A. Evidentiary Disputes

### 1. TriHealth's Motion to Strike

TriHealth says the Court should strike Abernathy's affidavit because it directly contradicts her prior deposition testimony regarding (1) her asthma, (2) when she raised concerns of her asthma, (3) her meetings with Conner, and (4) her resignation. (Doc. 32, #805–13). Or at the very least, TriHealth says, the affidavit, if not directly contradictory, is sufficiently contradictory to dismiss it as a sham affidavit. (*Id.* at #813–14).

In support of its motion, TriHealth relies on *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899 (6th Cir. 2006), so the Court starts there. In essence, *Aerel* "holds that a party cannot create a genuine dispute by submitting an affidavit at the summary judgment stage that contradicts the party's deposition testimony." *Hernandez-Butler v. Ikea U.S. E., LLC*, 435 F. Supp. 3d 816, 833 (S.D. Ohio 2020); *Aerel*, 448 F.3d at 908–09. Said differently, it instructs district courts to strike any portions of post-deposition affidavits that directly contradict the non-moving party's prior testimony, unless the party can provide a "persuasive justification" for the change. *Aerel*, 448 F.3d at 908. What amounts to a "direct contradiction," though, is narrowly defined. *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). At bottom, when the non-moving party was questioned generally, but not expressly, about a topic, a later affidavit providing greater detail does not directly contradict the prior testimony. *See id.* That

is because a "deponent is under no obligation to volunteer information not fairly sought by the questioner." *Aerel*, 448 F.3d at 907.

But that is not the whole story. Even if the post-deposition affidavit does not *directly* contradict prior testimony, the court still should strike the affidavit if it otherwise "constitutes an attempt to create a sham fact issue." *Aerel*, 448 F.3d at 908 (citation omitted). In making that determination, a "useful starting point … is the [following] nonexhaustive list of factors[:] whether the affiant was cross-examined [on the issue] during [her] earlier testimony, whether the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

At its core, then, *Aerel* prohibits a party from relying on a later-filed affidavit to dispute key facts to which that party already testified (and on which the moving party relied in moving for summary judgment), absent an acceptable justification to explain the late-arising dispute. *Hernandez-Butler*, 435 F. Supp. 3d at 833. And what amounts to an acceptable justification may depend on just how direct the contradiction is. *See Aerel*, 448 F.3d at 908–09. But as principally relevant here (see below), *Aerel* does not prevent a party from providing additional evidence on issues that were not explored during earlier testimony, or from offering an account that merely clarifies gaps or confusion in that testimony. *Id.* at 907.

Applying that framework here, the Court first notes that it was Abernathy—the non-moving party—who filed an affidavit after TriHealth moved for summary judgment. (Doc. 26). So this is precisely the after-arising-facts situation *Aerel* addressed. The Court therefore considers whether Abernathy's affidavit sufficiently contradicts her deposition testimony to warrant striking on each of the four factual grounds TriHealth raises.

Start with her asthma. At her deposition, Abernathy testified that her episodic asthma sometimes flares up "due to the cold" and that she uses an inhaler, medication, and diet modifications to help control it. (Doc. 19, #218, 237). She further stated that she had not previously—while working at TriHealth or elsewhere—requested any interventions or accommodations because of her asthma. (*Id.* at #227, 237–38, 253). And when asked whether she saw her physician's determination (on a medical questionnaire) that her asthma impacts no specific major life activities and/or bodily functions, Abernathy responded by saying, "[c]orrect." (*Id.* at #220).

According to TriHealth, Abernathy's deposition testimony failed to articulate how "her asthma affects any major life activities, or her work performance in any way." (Doc. 32, #807). So, TriHealth argues, Abernathy's later affidavit, which states that her asthma attacks "significantly impact[] [her] ability to breathe" and her ability to "assist[] and car[e] for patients in a medical setting," (Doc. 26 ¶¶ 9–10, #546–47), contradicts her deposition testimony.

The problem with that argument is that TriHealth's counsel never asked Abernathy whether or how her asthma affects her breathing. And while TriHealth is

right that Abernathy *acknowledged* that *her physician* asserted Abernathy's asthma does not affect her ability to breathe, (Doc. 19, #219–20), TriHealth wrongfully concludes that this acknowledgement gave rise to a duty on Abernathy's part to volunteer additional information to "dispute or attempt to clarify" that determination. (Doc. 32, #807). She simply wasn't asked to do so. TriHealth also correctly notes that Abernathy stated she never had to request an asthma-related accommodation from TriHealth. (*Id.* (citing Doc. 19, #227)). But again, no one asked Abernathy to explain how an asthma attack affects her breathing or ability to work. Under *Aerel*, a "deponent is under no obligation to volunteer information not fairly sought by the questioner." 448 F.3d at 907. The Court therefore declines to strike paragraphs 9 and 10 of Abernathy's affidavit.

Separately, TriHealth asks the Court to strike affidavit paragraphs 6, 7, and 8, which also concern Abernathy's asthma. (Doc. 32, #807). Those paragraphs, however, largely affirm what Abernathy testified to in her deposition: that an inhaler alone doesn't control her asthma, that other medications help control her asthma, and that her asthma is episodic in nature, (Doc. 19, #218). So the Court will not strike those paragraphs either.

Now consider the second factual category—when it was that Abernathy first raised concerns about her asthma. TriHealth argues that Abernathy testified that she first provided documentation of her asthma on January 15, 2021. (Doc. 32, #809 (citing Doc. 19, #253–54)). But, while that might have been the first time she provided written *documentation*, Abernathy also testified at her deposition that in August

2020 she *told* Conner she was "unable to do [C]ovid due to [her] asthma." (Doc. 19, #213). So her affidavit, in which Abernathy states that she did not wait until after her termination to advise Conner of her asthma concerns, (Doc. 26 ¶ 25, #548), does not contradict her earlier testimony; rather, it matches her earlier testimony. For that reason, the Court concludes that paragraph 25 is not seeking to create a sham fact issue and thus declines to strike it.

Next, consider Abernathy's meetings with Conner—the third factual category TriHealth challenges. Abernathy testified that during her second meeting with Conner on January 14, 2021, she told Conner she "could not go" to the Clinic. (Doc. 19, #205). TriHealth argues that paragraphs 11 through 22 of Abernathy's affidavit contradict that deposition testimony by "creating additional conversations which did not occur." (Doc. 32, #810). The Court, however, does not agree. To see why, take the affidavit paragraph-by-paragraph.

Paragraph 11 reports that Abernathy met with Conner twice on January 14, 2021, initially for 10 minutes and then for another 15 minutes in Conner's office. (Doc. 26, #547). During her deposition, Abernathy testified she met twice with Conner on January 14, 2021, and she was never questioned about how long she spent in Conner's office. (Doc. 19, #201–02, 205). So paragraph 11 provides a non-contradictory detail that, at most, further clarifies her deposition testimony about those two meetings.

Paragraph 12 states that, in their first meeting, Conner told Abernathy that "if [she] didn't report to the COVID Clinic, [she] had to leave." (Doc. 26, #547). In her deposition, counsel asked Abernathy, "[a]nd [Conner] tells you to go to the clinic to

assist [NP Evans], correct?" to which Abernathy replied, "[c]orrect." (Doc. 19, #201). But beyond that, counsel did not ask Abernathy to describe, in narrative form, what else Conner may have said in their first meeting, nor whether Conner told her that if she didn't report she had to leave. Abernathy, therefore had no obligation to volunteer information on those topics. Paragraph 12's offering of those additional details, then, does not dispute the deposition testimony, but merely clarifies gaps.

In paragraph 13, Abernathy recalls "gather[ing] [her] thoughts for about 15 minutes and return[ing] to the office." (Doc. 26, #547). By contrast, at her deposition, in response to the question of how long she was gone from the office, she recounted being gone "less than five minutes." (Doc. 19, #202). True, fifteen minutes is longer than five minutes, and counsel did directly inquire about the length of Abernathy's absence. But the difference between five and fifteen minutes, in context here, is not a material fact when it comes to whether TriHealth discriminated against Abernathy because of her asthma. As such, the Court concludes that paragraph 13 does not attempt to create a sham issue of material fact.

In Paragraph 14, Abernathy remembers "ask[ing] Ms. Conner for an accommodation of [her] conditions in the form of being excused from the COVID Clinic" during their second meeting. (Doc. 26, #547). When asked about their second meeting at the deposition, Abernathy testified as follows:

Q. And in that conversation did [Conner] tell you to go to assist Carol?

A. Yes.

Q. And did you say you were not going to go assist Carol?

A. I told her I could not go.

12

> Q. And did you say that if she was going to require you to go that you were going to quit?
>
> A. No.

(Doc. 19, #205). Importantly, counsel did not ask Abernathy what she said at that meeting about *why* she would "not go," nor did counsel ask Abernathy whether she requested an accommodation (and, if so, how). Accordingly, here again the Court cannot agree that her affidavit contradicts her deposition testimony. At the risk of undue repetition, Abernathy had no obligation at her deposition to fill the gaps about what else she and Conner may have discussed during their meetings.

Paragraph 15 notes that, during the second meeting, Conner asked Abernathy to step out of her office while Conner spoke with HR. (Doc. 26, #547). Since counsel never asked Abernathy at her deposition about whether Conner conversed with HR, the Court does not view that paragraph as contradictory.

Paragraph 16, which states that in their second meeting, Conner "told [Abernathy] that if [she] didn't report to the COVID Clinic [she] had to leave," (*id.*, #547), parallels paragraph 12. At the deposition, counsel asked if Conner told Abernathy to go assist NP Evans. (Doc. 19, #205). In other words, counsel did not ask Abernathy to recount everything she could remember about her conversation with Conner. As such, Abernathy's affidavit does not sufficiently contradict her deposition testimony to warrant striking.

In paragraph 17, Abernathy explained that Conner's office door remained closed with no one else in the room each time they met. (Doc. 26, #547). When counsel inquired at the deposition about the meetings' whereabouts, Abernathy testified that

"[they] didn't talk in front of [other] employees. [They] were in his [sic] office." (Doc. 19, #241). And she added that she "believe[d] the door was closed." (*Id.* at #242). So there is no contradiction here either.

In paragraph 18, Abernathy declares that "[i]n both meetings with Ms. Conner," she explained her "concerns about working in TriHealth's COVID Clinic and how that would negatively impact [her] breathing and [her] health due to [her] asthma." (Doc. 26, #548). Again, at Abernathy's deposition, counsel did not ask Abernathy whether she raised concerns about her asthma during her meetings with Conner. So the Court cannot strike this paragraph as contradicting her deposition testimony.

Paragraphs 19 to 22 convey that Conner never offered Abernathy an accommodation, interacted with her to find an accommodation, nor expressed how an accommodation would negatively impact TriHealth. (*Id.* at #548). Rather, Conner apparently told Abernathy only that she "had to leave" if she did not report to the Clinic. (*Id.* ¶ 22, #548). But again, no line of questioning about Conner's comments (or lack thereof) regarding an accommodation ever occurred at Abernathy's deposition. So these paragraphs are non-contradictory.

Paragraph 36—the last one TriHealth groups into this factual category—states that Abernathy has "no independent recollection of N.P. Evans going to the COVID Clinic on January 14, 2021." (Doc. 26, #549). But when asked if Evans went to the Clinic at her deposition, Abernathy testified that she "believe[d]" Evans did go to the Clinic. (Doc. 32, #810–11 (citing Doc. 19, #199)). These statements are in direct

conflict. And Abernathy's affidavit does not explain the reason for this now-differing recollection. Accordingly, the Court views the affidavit as contradictory to her prior testimony and strikes paragraph 36.

That leaves the topic of Abernathy's resignation. At her deposition, Abernathy testified that Conner told her she "was terminated" and "had to leave" on January 14, 2021. (Doc. 19, #207). She further admitted that she understood her employment with TriHealth ended that day. (*Id.*). In her affidavit, Abernathy states that she did not resign from TriHealth on January 14, 2021, (Doc. 26 ¶ 23, #548), but that TriHealth terminated her employment on January 15, 2021, (*id.* ¶ 24, #548). Ultimately, the Court views the first statement in affidavit paragraph 23 as not contradictory, but agrees that the statement in paragraph 24 is contradictory. Paragraph 23 (where she says she did not resign on January 14, 2021) aligns with Abernathy's disposition testimony that TriHealth terminated her on that date. (Doc. 19, #207). Affidavit paragraph 24, however, directly contradicts Abernathy's testimony that her employment ended on January 14. That is, she now claims that her employment ended on January 15, rather than on January 14, and does so without offering any explanation for this change in her understanding of the events. So the Court strikes affidavit paragraph 24 as directly contradictory.

In many ways, as detailed above, Abernathy's affidavit amounts to a gap-filler that provides the Court with more information at the summary judgment stage—something *Aerel* expressly permits. 448 F.3d at 907 ("This is a far cry, however, from preventing a party who was not directly questioned about an issue from

15

supplementing incomplete deposition testimony with a sworn affidavit."). Because Abernathy's affidavit only directly contradicts her deposition testimony in paragraphs 24 and 36 and does not otherwise attempt to create sham issues of material fact, the Court **GRANTS IN PART** TriHealth's motion to strike as to those two paragraphs but **DENIES IN PART** TriHealth's motion as to the rest of the affidavit.

### 2. Abernathy's Objections

Abernathy, for her part, also takes issue with part of the record. First, in her opposition, she challenges four documents that TriHealth relies on in its summary judgment motion as unauthenticated hearsay that the Court cannot properly consider at the summary judgment stage. Specifically, the four documents are: (1) TriHealth's "COVID-19 Policy: Team Member Refusal to Work/Job Abandonment," and "Physician Offices and Outpatient COVID-19" documents, (Doc. 22-1); (2) what appears to be a printout of Abernathy's patient encounters, (Doc. 19-2); (3) what appears to be a printout of Abernathy's schedule (Doc. 19-3); and (4) an FMLA Notice of Eligibility and Rights and Responsibilities, (Doc. 19-5). (Doc. 27, #615–17, 623). Second, Abernathy challenges various documents TriHealth filed with its reply, namely: Conner's declaration and the documents attached to it, (Doc. 31-1); TriHealth's supplemental response to Abernathy's first set of discovery requests, (Doc. 31-2); and documents that Abernathy apparently produced during discovery, (Doc. 31-3). (Doc. 34). Conner's declaration, Abernathy argues, is an inappropriate attempt to lay a foundation for documents similar to those TriHealth initially tried

to produce in its summary judgment motion (i.e., the documents Abernathy claims are hearsay). (*Id.* at #839). Abernathy objects to the Court's consideration of the declaration because it was first introduced in TriHealth's reply, and because it allegedly contradicts Conner's deposition testimony. (*Id.* at #840–42). As for the supplemental discovery response and the documents Abernathy apparently produced, Abernathy claims those are unauthenticated and therefore not properly considered. (*Id.* at #842).

Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Such an objection "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 737 (S.D. Ohio 2017) (citing 2010 advisory committee notes to Rule 56(c)(2)).

### a.    Objections to Documents 19-2, 19-3, 19-5, and 22-1

Abernathy's challenge to the four documents TriHealth attaches to or relies on in its summary judgment motion[2] misunderstands what is required at the summary judgment stage. As noted, a party may object that "material cited to support … a fact cannot be presented in a form that *would be* admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). In other words, at the summary judgment stage, evidence

---

[2] The Summary Judgment Motion is docket entry 22, so "Doc. 22-1" refers to a document attached to that motion. The remaining three documents are exhibits to Abernathy's deposition transcript. That transcript was filed as docket entry 19.

does not yet have to be in a form admissible at trial. *Leveline v. Schindler Elevator Corp.*, 630 F. Supp. 3d 874, 880 (E.D. Ky. 2022) (citing *Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 304–305 (6th Cir. 2016)). Here, then, so long as the documents TriHealth produced could be presented at trial in a form that would be admissible, that suffices.

Start with TriHealth's Covid Policy. (Doc. 22-1). TriHealth defends the admissibility of this document as either (1) non-hearsay under Federal Rule of Evidence 801(d)(2)'s statement of an opposing party, or alternatively, (2) hearsay that qualifies under Rule 803(6)'s business records exception. (Doc. 33, #823–24).

The Court disagrees that the Covid Policy qualifies as non-hearsay. Rule 802(d)(2) excludes from the definition of hearsay any statements that are made by, or attributable to, the opposing party and are offered against that party. But here, TriHealth, not Abernathy, made the statement. And the Rule does not exclude from hearsay TriHealth's own out-of-court statements when it is TriHealth that offers them.

The Court does agree, however, that TriHealth could present the Covid Policy in an admissible form at trial under Rule 803(6)'s business records exception. That exception allows a party to introduce a record of an act, event, condition, opinion, or diagnosis if:

> (A)    the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B)    the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)    making the record was a regular practice of that activity;

(D)    all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)    the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). The Court is persuaded that TriHealth either has met or can meet each of these requirements. First, TriHealth developed the Covid Policy in response to the Covid-19 pandemic, and distributed it on TriHealth letterhead, which implies that it is an authentic version of the Policy. *See Leveline*, 630 F. Supp. 3d at 880. Second, there is nothing to suggest this Policy was not kept in the ordinary course of business. Third, creating operational policies is a regular practice of healthcare institutions. Fourth, TriHealth can almost certainly call on a custodian to testify to and verify the Policy. Finally, there is nothing on the face of the Policy that indicates a lack of trustworthiness. And although Abernathy argues that, as of now, TriHealth has failed to authenticate the Policy, she has not argued that the Policy *could not be presented* at trial in an admissible form.

So too with the other three documents Abernathy challenges: Documents 19-2, 19-3, and 19-5. The first, Document 19-2, is seemingly a record that TriHealth made, in its regular course of treating patients, each time Abernathy encountered a patient. Document 19-3 likewise appears to memorialize schedules TriHealth created for its providers and medical assistants in the regular course of its staffing operations. And Document 19-5 represents an FMLA Notice of Eligibility TriHealth created in its

19

regular course of responding to employees' leave of absence requests. So each document presumably satisfies Rule 803(6)'s first two requirements. Recordkeeping—Rule 803(6)'s third requirement—of patient encounters, employee schedules, and FMLA Notices is a regular activity of most healthcare entities. And as with the Covid Policy, TriHealth can almost certainly call on a custodian to testify to and verify the records (requirement four) if needed. Finally, nothing on the face of any of the three documents suggests untrustworthiness, meeting the last requirement. In any event, Abernathy again did not object that TriHealth could not authenticate these documents or otherwise present them in a form that that would be admissible in evidence. So these documents either fall within, or could be presented in a manner at trial that would fall within, Rule 803(6)'s hearsay exception. That means the Court can properly consider these documents, too.

### b.    Objections to Documents 31-1, 31-2, and 31-3

Abernathy's second set of objections, by contrast, are mostly well taken. On the one hand, a party can properly file reply affidavits if they respond only to the opposing party's brief. *Key v. Shelby Cnty.*, 551 F. App'x 262, 264 (6th Cir. 2014). On the other hand, when a moving party submits *new* evidence in a reply brief, that "vitiate[s]" the non-moving party's ability to respond thus undermining Rule 56(c)'s purpose. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003).

How does that play out here? The Court concludes that it can properly consider Conner's affidavit, but that it cannot consider any of the other documents attached to TriHealth's reply. Conner's affidavit explains how she received TriHealth policy

updates and communicated those updates to her direct reports like Abernathy. (Doc. 31-1, #756–57). That, in turn, directly responds to Abernathy's argument that no one at TriHealth ever presented her with the Covid-19 Policy. (Doc. 26, #550; Doc. 27, #623). And contrary to Abernathy's suggestion, the affidavit does not directly contradict Conner's deposition testimony. Conner testified that she didn't know the specifics of TriHealth's policies for requesting accommodations. (Doc. 21, #452). Her declaration merely explains that she generally knew of the policies leadership sent her and would have shared those policies with her direct reports during their morning huddles. (Doc. 31-1, #757). Speculative or not, that doesn't contradict her deposition testimony. So the Court can consider Conner's affidavit.

The Court cannot, however, consider the documents attached to the affidavit, (Doc. 31-1, #758-64), or the other documents accompanying TriHealth's reply, (Docs. 31-2, 31-3).[3] That's because these documents amount to late-filed evidence, and considering them would vitiate Abernathy's ability to respond. *See Morse v. Fifty W. Brewing Co. LLC*, No. 1:21-cv-377, 2024 WL 1151794, at*4 (S.D. Ohio Mar. 18, 2024). Indeed, the very case TriHealth cites to support its argument affirmed the district court's consideration of two affidavits attached to the defendant's reply precisely because they "did not offer *new evidence* or arguments in the filing." *Key*, 551 F. App'x

---

[3] TriHealth submitted its Covid-19 Policy both in Document 22-1, which the Court can properly consider, and Documents 33-1 and 33-2 (along with other newly submitted documents), which the Court will not consider. That said, TriHealth's Covid-19 Policy is fair game for summary judgment purposes as explained above.

at 264 (emphasis added). So if TriHealth wanted the Court to consider these documents, it could have submitted them with its initial motion.

Ultimately, then, because the only document the Court will consider is Conner's affidavit (which again merely responded to Abernathy's opposition), the Court need not grant Abernathy leave to file a sur-reply.

## B. Summary Judgment Analysis

Having addressed the various evidentiary disputes, the Court now turns to the main event—TriHealth's motion for summary judgment. Abernathy alleges (1) disability discrimination, (2) disability discrimination based on association, (3) failure to accommodate, and (4) retaliation, each under both the ADA and Ohio's discrimination statute, Ohio Revised Code § 4112.02. (Doc. 2, #33–37). Notably, Ohio's disability-discrimination statute parallels the ADA. *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007). So the Court applies the same analysis to the state and federal claims Abernathy raises as to each of her four causes of action, which the Court will consider in turn.[4]

### 1. Disability Discrimination

The ADA prohibits employers from discriminating against qualified individuals based on a disability. 42 U.S.C § 12112(a). ADA plaintiffs can prove

---

[4] TriHealth's argument that Abernathy has conceded her state-law claims as undisputed is not well taken. (Doc. 33, #817). As the standard for the ADA and Ohio law is the same, any argument in support of Abernathy's ADA claim applies to the Ohio law claim, as well, whether she specifically cites the Ohio law claim or not. Thus, for summary judgment purposes, they rise or fall as a unit.

discrimination in one of two ways, directly or indirectly. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). Each has its own test. *Id*. A plaintiff pursuing a direct evidence theory must point to evidence that "does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor" in the employment decision. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (alteration in original) (quoting *Hostettler*, 895 F.3d at 853). Indirect or circumstantial evidence cases, by contrast, rest on evidence that creates an inference of discrimination. *Hartmann v. Graham Packaging Co.*, No. 1:19-cv-488, 2022 WL 219385, at *5 (S.D. Ohio Jan. 25, 2022). Here, Abernathy offers no direct evidence that TriHealth based its adverse employment action on Abernathy's claimed disability (indeed, it denies having made any employment decision at all), so the Court will apply the indirect-evidence framework.[5] *See Kleiber*, 485 F.3d at 868–69.

Cases relying on indirect evidence employ the familiar *McDonnell Douglas* burden-shifting framework at summary judgment. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). First, Abernathy must make out a prima facie case of disability discrimination. This requires her to show by a preponderance of the evidence that (1) she has a disability, (2) she is otherwise qualified for the position, with or without a reasonable accommodation, (3) she suffered an adverse employment decision, (4) her employer knew or had reason to know of her disability, and (5) she was replaced or her position remained open. *Id*. Second, if Abernathy makes the

---

[5] Both parties seemingly agree that the indirect test applies, as each argues that Abernathy has or has not met her burden in making a prima facie case of disability discrimination. (Doc. 23, #481–87; Doc. 27, #626–28).

requisite showing, the burden shifts to TriHealth to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 567 (quotation omitted). This burden is merely one of production, not persuasion, and it involves no credibility assessment. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). Finally, if TriHealth offers a legitimate, non-discriminatory reason for its action, then the burden shifts back to Abernathy to show, once again by a preponderance of the evidence, that TriHealth's provided reason amounts to "pretext designed to mask discrimination." *Hrdlicka*, 63 F.4th at 567 (quotation omitted).

Before diving into that analysis, though, the Court observes, as it has before, the tension that arises in applying a "preponderance of the evidence" standard at summary judgment. *Burress v. Spring Grove Cemetery & Arboretum*, No. 1:18-cv-879, 2020 WL 3036047, at *8–9 (S.D. Ohio June 5, 2020). Evidentiary burdens such as a "preponderance" typically involve weighing competing evidence and undertaking credibility assessments. That is not the usual grist of a summary judgment analysis, which instead asks whether the competing evidence creates a "genuine issue of material fact." Yet, the Supreme Court itself has referred to a "preponderance of the evidence" standard in describing the *McDonnell Douglas* test, *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), and courts have more or less faithfully repeated that framing since.

That said, it also appears that courts have sought to bridge the gap by understanding "preponderance of the evidence" merely to mean that the plaintiff has

created at least a genuine dispute of material fact as to each element of the required showing at a given stage, such as a prima facie case. *See, e.g., Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) ("On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry."); *Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 581 (6th Cir. 2017). And that is the understanding of "preponderance" that the Court will employ here.

But that leads to an additional incongruity. As the Sixth Circuit has further explained, once a discrimination claim reaches trial, "it is normally inappropriate to instruct the jury on the *McDonnell Douglas* analysis." *Beard v. AAA of Mich.*, 593 F. App'x 447, 453–54 (6th Cir. 2014) (quoting *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 593 (6th Cir.2003)); *see also, e.g., Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 576 (5th Cir. 2004) ("This Court has consistently held that district courts should not frame jury instructions based upon the intricacies of the *McDonnell Douglas* burden shifting analysis."). In other words, it appears that, at the summary judgment stage of an employment discrimination case, the Court's job is to determine whether genuine disputes of material fact exist on issues (i.e., as to each element of the prima facie case) a jury will never be asked to resolve. Be that as it may, that is the framework that precedent commands, so that is the framework the Court will apply.

Turning back to Abernathy's claim, the Court begins by addressing whether Abernathy met her burden as to the five elements needed to establish a prima facie case of disability discrimination. The Court ultimately concludes that she has not. To

see why, take each of the elements in turn—minus the second element (whether Abernathy was "otherwise qualified" for her medical assistant role), which TriHealth does not dispute.

### a.  Whether Abernathy Suffers From a Disability

Whether a person has a disability—the first element of Abernathy's prima facie case—is a threshold inquiry under the ADA. *Burns v. Coca-Cola Enters.*, 222 F.3d 247, 253 (6th Cir. 2000). The statute defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A).[6] Courts usually analyze the disability inquiry in three parts, asking (1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts one or more major life activities; and (3) whether the claimed disability substantially limits the identified major life activity. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

The first two prongs—physical impairment and impact on major life activity— pose no hurdles for Abernathy. Asthma constitutes a physical impairment.[7] *Svoboda*

---

[6] The statute also includes two alternative "disability" definitions: persons with "a record of such an impairment" and persons "being regarded as having such an impairment." 42 U.S.C. §§ 12102(1)(B)–(C). Abernathy alleged that she and Kelly were "regarded" as disabled, (Doc. 2, #33), but she does not defend that line of argument in her opposition. So the Court finds that she failed to meet her burden in establishing that she has a disability in that regard. And while TriHealth explains why Abernathy failed to show she satisfied the "record of impairment" definition, (Doc. 33, #827–28), Abernathy made no arguments of the sort in her brief—at least as the Court can tell. So, again, she failed to meet her burden in establishing that she has a "record of impairment." The Court thus proceeds on only the first aspect of the "disability" definition—whether Abernathy's condition substantially limits a major life activity.

[7] Abernathy initially alleged that she and Kelly suffer from "several underlying health conditions … including … diabetes" in her Complaint. (Doc. 2 ¶ 10, #31). But, when a party refers to an issue "in a perfunctory manner, unaccompanied by some effort at developed

*v. TimkenSteel Corp.*, No. 5:18-cv-1443, 2020 WL 1513710, at *7 (N.D. Ohio Mar. 30, 2020) (explaining that since "[a]sthma is a physiological disorder or condition that affects the respiratory system," it falls within 29 C.F.R. § 1630.2(h)(1)'s definition). And both breathing and working count as major life activities. 29 C.F.R. § 1630.2(i)(1)(i). TriHealth does not dispute either point.

Where the parties part ways is on the third prong—whether Abernathy met her burden in establishing that her asthma "substantially limits" her ability to breathe and work. (*Compare* Doc. 23, #481–82, *with* Doc. 27, #619–21). To determine if a disability substantially limits a major life activity, courts must "compare the person claiming a disability to 'most people in the general population.'" *Hostettler*, 895 F.3d at 853 (citing 29 C.F.R. § 1630.2(j)(1)(ii)). But, when considering an episodic impairment, the Court should make that comparison based on the level of impairment that exists when the condition is active, like during an asthma attack. *See* 42 U.S.C § 12102(4)(D); *see also Simon, Tr. for Est. of Torres-Duqum v. Univ. Hosps. Cleveland Med. Ctr.*, No. 24-3379, 2025 WL 66756, at *3 (6th Cir. Jan. 10, 2025). The Court should also consider the impairment in its untreated form (e.g., an asthma attack without an inhaler). 42 U.S.C § 12102(4)(E)(i). Moreover, in assessing the results of that comparison, the Americans with Disability Act Amendments Act puts a further thumb on the scale, instructing courts to construe the term

---

argumentation," the court may consider the issue forfeited. *Peters v. Metro. Gov't of Nashville & Davidson Cnty.*, __ F. Supp. 3d __, 2024 WL 3826358, at *11 (M.D. Tenn. 2024) (quoting *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022)). Here, Abernathy makes only one passing reference to diabetes in her opposition, stating that she "also suffers from diabetes." (Doc. 27, #613). Her failure to develop her diabetes claim in any way means she has forfeited it.

"substantially limits" "broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i).

That said, even while directing courts to broadly construe the term, Congress did not dispense of the "substantially limits" requirement altogether. *Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 434–35 (6th Cir. 2016). Put another way, Abernathy must still make some showing that her asthma substantially limits her ability to breathe. *See* 29 C.F.R. § 1630.2(j)(1)(ii) ("Nonetheless, not every impairment will constitute a disability within the meaning of this section.").

The Court concludes that Abernathy has met her burden. *See Edwards v. Shelby Cnty.*, No. 22-cv-2682, 2024 WL 2964847, at *19 (W.D. Tenn. June 12, 2024) (finding the plaintiff's sworn statement that her asthma is "severe" and can cause difficulty performing various tasks when active satisfied the first prima facie element). In her affidavit, Abernathy stated that an asthma attack can hit her at any time, and when it does, it "significantly impacts [her] ability to breathe" and "adversely impact[s] [her] ability to accomplish normally routine tasks associated with officer [sic] work." (Doc. 26, #546–47).

TriHealth's argument that she did not meet her burden on this element largely rests on its assertion that the Court cannot consider her affidavit, an argument the Court rejected above. But to TriHealth's credit, if considering Abernathy's deposition testimony alone, the Court may well have concluded that she did not establish that asthma substantially limits her ability to breathe or work. Indeed, recent Sixth Circuit caselaw suggests that asthma does not qualify as a disability under the ADA

if the plaintiff fails to show it is "severe enough" to substantially limit a major life activity. *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127, at *4 (6th Cir. Aug. 21, 2024). But given Abernathy's affidavit, in which she clearly states that asthma attacks do significantly affect her ability to both breathe and accomplish work tasks, the Court concludes that she has created at least a genuine dispute as to this element of her prima facie case.

### b. Whether Abernathy Suffered an Adverse Employment Action

As noted, TriHealth does not dispute the second element of Abernathy's prima facie case, so the Court moves to the third element, which requires a plaintiff to show that she suffered an adverse employment decision. Here, Abernathy claims TriHealth terminated her. (Doc. 19, #207). Not surprisingly, that normally counts as an adverse employment action. *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002). TriHealth, however, contends that Abernathy voluntarily resigned from her medical assistant role on January 14, 2021, and thus cannot meet her burden on this element. (Doc. 23, #485–87). To prove its point, TriHealth argues that Abernathy twice left her shift on January 14, 2021, before it was scheduled to end. (*Id.* at #486). And it further relies on two texts Abernathy sent to Conner. The first text, sent on January 14, 2021, stated: "I have not terminated my position." (Doc. 19-4, #335). The second, sent on January 15, 2021, informed Conner that Abernathy wouldn't "be in" that day, requested that Conner "[p]lease use PTO" to account for Abernathy's absence, and said Abernathy would "see [Conner] on Monday." (*Id.*). According to TriHealth, that

second text represents Abernathy's attempt to "erase what was already done," and proves that she resigned. (Doc. 23, #485).[8]

The Court isn't so sure. For starters, Abernathy's first text suggests that she did *not* resign, not that she did. And at her deposition, Abernathy repeatedly denied resigning from her position. (Doc. 19, #201, 205). Moreover, she testified that on January 14, 2021, Conner told her that her "position was terminated and [she] had to leave." (*Id.* at #207). That evidence, if a jury were to believe it, also suggests that TriHealth terminated Abernathy, not that Abernathy resigned. Drawing all inferences in Abernathy's favor, the Court cannot conclude as a matter of undisputed fact that she resigned, as opposed to TriHealth terminating her.

### c.    Whether TriHealth Knew of Abernathy's Disability

The Court now turns to the fourth prima facie element—whether TriHealth knew or had reason to know of Abernathy's alleged disability. Typically, an employer knows of an employee's disability when the employee tells the employer of her condition. *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016). The employee need not use the word "disabled" to notify the employer of her disability, "but the employer must know enough information about the employee's condition to conclude that [s]he is disabled." *Id.* Information the employee may provide includes, for example, "a diagnosis, a treatment plan, apparent severe symptoms, and

---

[8] TriHealth also argues that Abernathy confirmed she resigned when she applied for unemployment benefits because, on the benefits application, she marked the box "voluntary resignation" as the reason for unemployment. (Doc. 23, #487). But Abernathy testified that a benefits representative told her it was "the only choice [the form] had," and that she (Abernathy) "wasn't in agreement with that term." (Doc. 19, #236–37). So the Court, at the summary judgment stage, cannot say that this alone proves she resigned from TriHealth.

physician-imposed work restrictions." *Id.* All told, employers are "not required to speculate as to the extent of the employee's disability." *Hrdlicka*, 63 F.4th at 567 (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)).

Abernathy claims that she raised concerns about her asthma to Conner in August 2020 and again during her conversations with Conner on January 14, 2021. (Doc. 27, #622). And according to Abernathy, because of those exchanges, TriHealth knew or should have known of Abernathy's claimed disability. (*Id.* at #622–23, 627).[9] TriHealth argues that it did not know about Abernathy's disability because Abernathy never requested any accommodation or intervention related to her asthma or otherwise provide any medical documentation. (Doc. 23, #483–85). The Court considers each of the interactions Abernathy highlights in turn.

Start with the August 2020 interaction between Abernathy and Conner. At her deposition, Abernathy testified that she told Conner she was "unable to do [C]ovid due to [her] asthma and [Kelly]'s health." (Doc. 19, #213). This suggests Abernathy raised concerns about her asthma's potential impact as to certain job assignments— including a job assignment like the one that ultimately resulted in her separation from TriHealth. And remember, Abernathy was working at a health care facility. So a fellow healthcare provider presumably could understand the statement "I can't do

---

[9] In her opposition, Abernathy never directly explains why TriHealth knew or should have known of her claimed disability. Rather, she references earlier-made arguments as satisfying the element. (Doc. 27, #627 ("As discussed above, Ms. Abernathy has satisfied elements (a), (b), (c), and (d).")). Though she does not say so expressly, the Court presumes Abernathy was referring to her argument that she requested a reasonable accommodation, in which she maintains that TriHealth knew of her claimed disability. As such, the Court focuses its attention on that portion of Abernathy's brief.

Covid because of my asthma" to imply that the asthma was sufficiently severe that contracting Covid-19 may lead to serious complications. That alone is perhaps enough to put a healthcare-provider employer on notice that the asthma is severe enough to constitute a disability.

The Court need not decide that, however, because Abernathy has also presented evidence that she put TriHealth on notice of her disability on January 14, 2021, when Conner assigned her to work the Clinic. According to Abernathy, in both of her pre-termination meetings (or pre-resignation meetings, depending on whom you believe) with Conner that day, Abernathy "explained to [Conner her] concerns about working in TriHealth's COVID Clinic and how that would negatively impact [her] breathing and [her] health due to [her] asthma." (Doc. 26, #548).

True, it is undisputed that she did not provide documentation of her claimed disability until January 15, 2021, after TriHealth allegedly terminated her. (Doc. 19, #253–54). And according to Conner, Abernathy's stated reason for not reporting to the Clinic was that Kelly (her fiancé) recently had open heart surgery and "she did not want to put him at risk," rather than anything about asthma. (Doc. 21, #439).

But the Court's job at summary judgment is to credit the non-movant's evidence, to draw all inferences in her favor, and to refrain from making credibility determinations. Under that standard, Abernathy clears the hurdle, if barely, in showing that there is a genuine dispute about whether TriHealth knew of her disability before it allegedly terminated her. Reading the evidence in the light most favorable to Abernathy, a jury could find that Abernathy disclosed her asthma

32

diagnosis and explained the severe symptoms that might arise if she were exposed to Covid-19. (Doc. 26, #548). And Conner knew that Abernathy's usually-assigned physician did not work the Clinic, (Doc. 21, #413–14), which means Conner had never assigned Abernathy to work there, (*id.* at #426), thus explaining why Abernathy had never before needed to request a Clinic-related accommodation or intervention. Taking that all together, a reasonable factfinder could infer that Conner, without having to speculate, knew Abernathy's asthma was a disability.

As noted, it wasn't until January 15, 2021, that Abernathy presented the letter from her physician, explaining why she needed to be excused from the Clinic. (Doc. 19, #254; Doc. 2, #31). If Abernathy supplied that letter sooner it would have made it clear to TriHealth that her asthma was a disability. But at this juncture, especially where Abernathy's and Conner's testimonies about their conversations conflict, there is at least a genuine dispute about whether TriHealth knew Abernathy's asthma was a disability under the ADA when it allegedly terminated her.

### d. Whether TriHealth Replaced Abernathy

Element five of the prima facie case requires Abernathy to show that, after her termination, her position remained open or that TriHealth replaced her with a non-protected individual. TriHealth argues that Abernathy "made no showing or argument" about whether she was replaced or her position remained open. (Doc. 33, #833). True, Abernathy did not address that element in those terms. Instead, she argues that TriHealth treated similarly situated non-protected healthcare providers more favorably than Abernathy, (Doc. 27, #627), which is another way to establish

this element. *Welsh v. Automatic Data Processing, Inc.*, 954 F. Supp. 2d 670, 680 (S.D. Ohio 2013) (citing *Hopkins v. Elec. Data Sys.*, 196 F.3d 655, 660 (6th Cir. 1999)); *see also Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007).

Unlike the other elements, the Court concludes that Abernathy has failed to meet her burden as to this one. Abernathy argues that TriHealth treated her unfavorably by allowing physicians and other similarly situated, non-protected staff to opt out of Clinic duty, but not her. (Doc. 27, #612–13, 627). The Court is not persuaded. For starters, the Court is not convinced that Abernathy, a medical assistant, is "similarly situated" to a TriHealth physician. Those are different roles that come with disparate responsibilities and benefits. Certainly, Abernathy has offered no explanation why a physician's and a medical assistant's duties are similar "in all of the relevant aspects." *Jones v. Kilbourne Med. Lab'ys*, 162 F. Supp. 2d 813, 828–29 (S.D. Ohio 2000), *aff'd*, 35 F. App'x 203 (6th Cir. 2002) (cleaned up). True, Abernathy also argues that TriHealth treated other staff better in this regard. But she failed to identify any non-protected medical assistant who actually fell into this category. Admittedly, Conner's testimony *hinted* that medical assistants—the position Abernathy held—could perhaps opt out of Clinic duty if they had a medical reason to do so. (*See* Doc. 21, #396–99). But a hypothetical comparator will not do. *See Reynolds v. Szczesniak*, No. 21-2732, 2022 WL 3500191, at *7 (6th Cir. Aug. 18, 2022) ("Conclusory allegations that a hypothetical [] comparator would have received more favorable treatment are not entitled to an assumption of truth."). Conner's testimony, moreover, indicates that she "never had a [medical] assistant opt out" of

34

Clinic duty. (Doc. 21, #396). So, given that Abernathy has identified no non-protected medical assistant who she believes TriHealth treated more favorably, the Court concludes that she failed to meet her burden on this element.

Because Abernathy failed to make a prima facie showing of disability discrimination, the Court **GRANTS** TriHealth's motion for summary judgment on this claim.

### 2.    Disability Discrimination Based on Association

Next up is Abernathy's associational discrimination claim. TriHealth argues that the Court should grant summary judgment on this claim because Abernathy did not dispute dismissal of it. (Doc. 33, #817).

The Court can see why TriHealth makes that argument. In reality, though, it's not quite so simple. "[E]ven where a motion for summary judgment is unopposed a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists." *Kaivac, Inc. v. Stillwagon*, No. 1:19-cv-410, 2022 WL 7483134, at *2 (S.D. Ohio Oct. 12, 2022) (quotation omitted). But if the moving party properly made and supported the motion, and the nonmoving party failed to "respond with a showing sufficient to establish an essential element of its case," a court can grant summary judgment. *Id.* (quoting *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011)).

With that framework in mind, the Court turns to the claim itself. Three theories of associational discrimination exist: "(1) expense; (2) disability by association; and (3) distraction. *Stansberry*, 651 F.3d at 487 (cleaned up). An

employer violates the ADA under the expense theory "if it takes an adverse employment action against an employee because of the cost of insuring the associated disabled person under the employer's health plan." *Williams v. Union Underwear Co.*, 614 F. App'x 249, 354 (6th Cir. 2015). The disability by association theory, on the other hand, arises in two ways. First, if an employer worries that the employee will contract the associated person's disability. *Id.* Second, if the employee is related to the associated person by blood, and the employee is genetically predisposed to develop the disability. *Id.* Finally, under the distraction theory, an employer violates the ADA if it takes adverse employment action against an employee for being "somewhat inattentive at work because of the [associated person's] disability." *Id.* (quotation omitted).

In her Complaint, Abernathy alleged associational disability discrimination based on her association with her fiancé, Jonathon Kelly. (Doc. 2, #34–35). Since Abernathy and Kelly remain unmarried, with Kelly having his own insurance, (Doc. 19, #214–15; Doc. 27-1, #636), the Court can eliminate the "expense" theory. And because Kelly's claimed disabilities potentially include chronic asthma, heart disease, chronic obstructive pulmonary disease, diabetes, and congestive heart failure, (Doc. 2, #31)—all non-communicable conditions—the disability by association theory does not fit either.[10] That leaves the distraction theory. Abernathy, however, makes no claims that her inattention at work informed TriHealth's alleged firing decision. More than that, Conner could recall no complaints about Abernathy's work performance

---

[10] It goes without saying, but because Abernathy is not genetically related to Kelly, the second form of the "disability by association" theory also cannot apply.

other than one, which involved her speed in completing assignments. (Doc. 21, #412–15). So the Court is not persuaded that Abernathy's associational discrimination claim falls into any of the three recognized theories.

Even assuming the claim did fit within a theory, Abernathy did not establish a prima facie case. Again, because she provides no direct evidence that TriHealth terminated her because of Kelly's disability, the Court applies the *McDonnell Douglas* burden shifting test. *See Stansberry*, 651 F.3d at 487. To establish a prima facie case of associational disability discrimination, a plaintiff must show that (1) she was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to have a relative with a disability; and (4) the adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision. *Id.*

TriHealth does not dispute that Abernathy was qualified for her position (element one). And as explained above, there remains a genuine dispute about whether Abernathy suffered an adverse employment action (element two). But Abernathy fails to meet her burden in establishing elements three and four. Other than a conclusory allegation that she had an "associational relationship" with Kelly and that TriHealth knew Kelly was disabled, (Doc. 2, #33), Abernathy offers no evidence showing that Kelly is "disabled" as the ADA defines the term, nor how TriHealth apparently knew of his disability. And she makes no attempt to establish a reasonable inference that Kelly's claimed disabilities played a role in her alleged termination. All told, "no reasonable jury could believe there was a causal connection"

37

between Kelly's claimed disabilities and Abernathy's alleged firing. *Williams*, 614 F. App'x at 254–55. So the Court **GRANTS** summary judgment in favor of TriHealth on this claim.

### 3.      Failure to Accommodate

Now the Court turns to Abernathy's failure to accommodate claim. She alleges that TriHealth denied her a reasonable accommodation by refusing her request to be excused from working in the Clinic and by failing to engage in an interactive process to identify a reasonable accommodation. (Doc. 2, #31, 35–36).

### a.      Failure to Grant Abernathy's Request for Exemption from Clinic Duty

Unlike Abernathy's disability discrimination claim, the Court analyzes her failure to accommodate claim under the direct evidence test.[11] *Hostettler*, 895 F.3d at 853; *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). That is because if the Court accepts the employee's version of events, as it must at

---

[11] In its motion for summary judgment, TriHealth relied on the indirect evidence test to make its argument. (Doc. 23, #489 (outlining the elements of a prima facie failure to accommodate case)). Despite Abernathy explaining, in her opposition, that the direct evidence test applies, (Doc. 27, #618–19), TriHealth doubled down, again relying on the indirect evidence test in its reply, (Doc. 33, #825–26). The Court understands why TriHealth followed that approach. It maintains that Abernathy never requested an accommodation, or at least did not do so until after she allegedly resigned. (Doc. 23, #489–91). And since a prima facie case requires the plaintiff to establish that she requested an accommodation, TriHealth's argument fits neatly within the indirect evidence paradigm. Not to mention, Sixth Circuit caselaw into the 2010s sometimes applied the indirect evidence test to failure to accommodate claims. *See, e.g.*, *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014). More recent caselaw, however, clearly directs district courts to apply the direct evidence test to failure to accommodate claims. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024); *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (clarifying that "*Kleiber*, [the Sixth Circuit's] foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls"); *see also Blanchet*, 27 F.4th at 1227; *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018); *Tchankpa*, 951 F.3d at 811. So the Court must apply that approach here.

summary judgment, then "no inference is necessary to conclude that the employee has proven a failure to accommodate." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (cleaned up). Rather than relying on the *McDonnell Douglas* burden shifting approach, the direct evidence approach involves a multi-part test.

First, the plaintiff must establish that she has a disability. *Kleiber*, 485 F.3d at 869. Second, the plaintiff must establish that she is "otherwise qualified" for her job despite her disability. *Id.* To prevail here, "the plaintiff must show either: (1) the disability does not impact his or her ability to perform the job's functions in any way; (2) the disability impacts the plaintiff's ability to perform some job functions, but only functions plaintiff alleges are non-essential; or (3) the disability impacts the plaintiff's ability to perform some essential job functions, but he or she could perform all essential functions with an accommodation plaintiff alleges is reasonable." *Hartmann*, 2022 WL 219385, at *6 (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016)). Third, if the plaintiff satisfies those burdens, the employer must then prove "that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Kleiber*, 485 F.3d at 869 (quotation omitted).

Start with step one. As already discussed, Abernathy has established that there is at least a genuine dispute about whether her asthma is a disability as the ADA defines the term. So she satisfies that requirement.

Move to step two. Abernathy must show that, despite her asthma, she was "otherwise qualified" under one of the three established options. Her briefing, though,

is less than clear about which of the three options applies to her. (*See* Doc. 27, #622). In any case, given that her entire claim is premised on requesting an accommodation in the form of not working in the Clinic, the Court will analyze her argument under the third option. To meet her burden, then, Abernathy must show that she requested an accommodation and that it was objectively reasonable. *Yanick v. Kroger Co. of Mich.*, No. 23-1439, 2024 WL 1856680, *3 (6th Cir. Apr. 29, 2024) (citing *Kleiber*, 485 F.3d at 870).

Abernathy meets her burden on both fronts. During her meetings with Conner on January 14, 2021, Abernathy asked for an accommodation "in the form of being excused from the COVID Clinic." (Doc. 26, #547–48). Even if she didn't use the word "accommodation" during that meeting, she still meets her burden since the ADA does not require an employee to use "magic words" like "accommodation" or "disability" in making a request. *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014) (quotation omitted). Rather, Abernathy only had to "communicate[] a need for an adjustment at work because of [her] disability." *Yanick*, 2024 WL 1856680, at *4. And Conner, in assessing Abernathy's request, had to look to context and "draw reasonable inferences" from Abernathy's statements. *Id.* Abernathy says she previously raised concerns of her asthma to Conner in August 2020. (Doc. 19, #213). Conner also knew that Abernathy's usually-assigned physician did not work the Clinic. (Doc. 21, #413–14). Taking that context together with Abernathy's statements—that she could not work in the Clinic because it would negatively impact

her breathing due to her asthma, (Doc. 26, #547–48)—a reasonable jury could conclude that Abernathy made an accommodation request.

Beyond that, Abernathy's accommodation request "seems reasonable on its face." *Fisher*, 951 F.3d. at 419 (quotation omitted). Indeed, "[m]odified work schedules are a classic example of a reasonable accommodation." *Yanick*, 2024 WL 1856680, at *6 (citing 42 U.S.C. § 12111(9)(B)). Conner's testimony establishes both that physicians could opt out of Clinic duty and that employees could request medical accommodations through HR. (Doc. 21, #396–99, 426–27). And TriHealth's Covid Policy likewise permits employees with medical needs to request an exemption through HRBP. (Doc. 22-1, #468). In other words, TriHealth had an established mechanism to request exemptions from Clinic duty, which indicates that Abernathy's request for the same was reasonable. True, that established mechanism required Abernathy to go to HR, not Conner, to request the accommodation. But Abernathy testified that she attempted to reach HR to discuss such an accommodation on January 14, 2021, between her two meetings with Conner. (Doc. 19, #202–04). And also true, Abernathy could have been more proactive in seeking an accommodation, as she knew in advance of January 14, 2021, that she was assigned to the Clinic. But the Court hesitates to suggest that an employee must place herself into a work situation that a disability renders potentially lethal merely because the employee did not raise the issue earlier. Since Abernathy demonstrated that she requested a reasonable accommodation, the burden shifts back to TriHealth.

That leaves step three. To satisfy its burden here, TriHealth must show either that service in the Clinic is an essential business necessity or that Abernathy's proposed accommodation would have imposed an undue hardship. TriHealth demonstrates neither. It does not explain whether Clinic service is an essential business necessity—to the contrary, Conner's testimony that physicians could opt out of Clinic duty and that other staff could request medical exemptions seems to suggest it was *not* essential. (Doc. 21, #396–99, 426–27). And TriHealth does not argue that granting Abernathy's request for an exemption would have imposed an undue hardship—here, too, Conner's deposition testimony intimates it would not have. TriHealth thus fails to meet its burden at step three.

### b.    Failure to Engage in the Interactive Process

Abernathy further argues that Conner failed to engage in an interactive process to identify an accommodation that would meet Abernathy's needs. (Doc. 27, #622–24). TriHealth makes two arguments in response. First, it maintains that Abernathy resigned before she made any request for accommodation, which means TriHealth had no obligation to engage. (Doc. 33, #829). Second, it argues that even if Abernathy had not resigned, she walked out of both meetings with Conner, so TriHealth is not at fault for any breakdowns in the interactive process. (*Id.* at #830).

"Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler*, 895 F.3d at 857. As part of that process, the employer must, in good faith, "identify the precise limitations resulting from the

disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citations omitted). And that inquiry must be "individualized." *Id.*

The evidence Abernathy puts forward demonstrates that there is a genuine dispute about whether Conner engaged in an interactive process (or otherwise had the obligation to engage). Abernathy claims that, after requesting to be excused from Clinic duty, Conner did not offer any means of accommodating her asthma or interact in any way to find a reasonable accommodation. (Doc. 26, #548). And Abernathy testified that Conner terminated her. (Doc. 19, #207). Conner, however, testified that Abernathy resigned, (Doc. 21, #411, 435–37), which if true, would forestall her need to engage in the interactive process. *Gleed v. AT & T Mobility Servs., LLC*, 613 F. App'x 535, 539 (6th Cir. 2015). Precisely because of these competing reports, though, a genuine dispute of material fact exists. *Hostettler*, 895 F.3d at 857. The Court therefore **DENIES** TriHealth's motion for summary judgment on this claim.

### 4. Retaliation

Finally, the Court addresses Abernathy's retaliation claim. On this count, she alleged that TriHealth retaliated against her (1) by terminating her for requesting an accommodation and (2) by interfering with her right to collect unemployment benefits for applying to collect said benefits. (Doc. 2, #36–37).

Again, the Court must determine whether the indirect or direct evidence test applies. Because Abernathy does not claim to have direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework (i.e., the indirect

evidence test).[12] *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). First, to establish a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action." *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 450 (6th Cir. 2018) (cleaned up). The final prong requires the plaintiff to demonstrate but-for causation. *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016). Second, if the plaintiff meets her burden, the employer must then "articulate a legitimate, non-discriminatory reason" for the alleged retaliation. *Barlia*, 721 F. App'x at 450. Third, if the employer does so, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's reason was merely pretext. *Id.*; *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).

### a. Retaliation for Requesting an Accommodation

Start with step one—whether Abernathy established a prima facie case of retaliation for requesting an accommodation. For many of the reasons already discussed, she has. Requesting an accommodation constitutes a protected activity under the ADA, satisfying element one. *Hurtt*, 627 F. App'x at 422–23. And, as explained, there's at least a genuine dispute that Abernathy directly requested an

---

[12] The parties apply the indirect test in their briefing, (Doc. 23, #491; Doc. 27, #625), which further confirms that the Court should apply that test.

accommodation from Conner on January 14, 2021, so that satisfies element two.[13]
Beyond that, the Court has highlighted the competing evidence about whether
TriHealth terminated Abernathy or whether she resigned. So there's also a genuine
dispute about element three.

That leaves the fourth element of her prima facie case—whether Abernathy
can show a causal relationship between her request for an accommodation and
TriHealth allegedly terminating her. Because this element requires a but-for causal
relationship, "a plaintiff must 'produce sufficient evidence from which an inference
could be drawn that the adverse action would not have been taken' had the plaintiff
not engaged in a protected activity." *Dorsey v. DeJoy*, No. 1:18-cv-615, 2022 WL
908855, at *20 (S.D. Ohio Mar. 29, 2022) (quoting *Nguyen v. City of Cleveland*, 229
F.3d 559, 563 (6th Cir. 2000)).

Abernathy relies solely on temporal proximity to support her argument that a
causal connection exists between her requesting an accommodation and TriHealth
allegedly terminating her. (Doc. 27, #626). Unfortunately, though, Sixth Circuit
caselaw is not so clear about whether or when temporal proximity alone can satisfy
the causation element of a plaintiff's prima facie case. *Smith v. Advancepierre Foods,
Inc.*, No. 1:18-cv-242, 2020 WL 3488580, at *14 (S.D. Ohio June 26, 2020). One line of

---

[13] TriHealth argues that because Abernathy "could not request a reasonable accommodation
for [a] non-existent disability," she did not engage in a protected activity and therefore has
no retaliation claim. (Doc. 33, #831). But as the Court explained, Abernathy supplied facts
showing that there's at least a genuine dispute about whether she has a disability under the
ADA. Not to mention, whether she proved she has a disability under the ADA and whether
TriHealth had specific knowledge of the claimed disability are improper inquiries for a
retaliation claim. *Hurtt*, 627 F. App'x at 423 (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d
494, 502 (3rd Cir. 1997)). So TriHealth's argument on this front fails.

cases at least suggests that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Id.* (quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010)). But another line of cases suggests a very narrow exception to that rule. Under that exception, temporal proximity alone *can* be enough to establish a causal connection if the adverse action "occurs very close in time after an employer learns of a protected activity," such as when the adverse action occurs nearly contemporaneously with the protected activity. *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

The Court concludes that the latter is the correct understanding of the current state of Sixth Circuit law. And seeing as how TriHealth allegedly terminated Abernathy only 45 minutes (approximately) after she allegedly made a request for an accommodation, (*See* Doc. 21, #459–61), the Court concludes that is a short enough time for this case to fall on the nearly-contemporaneous-response side of the temporal divide. Abernathy, therefore, met her burden on element four, and established her prima facie case for summary judgment purposes.

Because Abernathy met her burden in establishing a prima facie case of retaliation, the burden shifts to TriHealth to articulate a legitimate, non-discriminatory reason that it terminated her. TriHealth answers by arguing that Abernathy's behavior was either insubordinate or a violation of TriHealth's Covid Policy, which in turn, are legitimate, non-discriminatory reasons to terminate her. (Doc. 23, #487–89). Specifically, TriHealth argues that she did not report to her assigned position on January 14, 2021; did not raise any concerns about her

assignment or otherwise request an accommodation prior to that shift; unilaterally reassigned herself to work triage; refused Conner's instruction to report to the Clinic; and twice left TriHealth's facility during her scheduled shift. (*Id.*).

It is well-established in the Sixth Circuit that "insubordination may constitute a legitimate, nondiscriminatory reason" for firing an employee. *Raadschelders v. Columbus State Cmty. Coll.*, 377 F. Supp. 3d 844, 858 (S.D. Ohio 2019) (collecting cases). Expressly violating company policy likewise constitutes a legitimate, non-discriminatory reason for an employer to take adverse employment action. *Schwendeman v. Marietta City Schs.*, 436 F. Supp. 3d 1045, 1061 (S.D. Ohio 2020) (citing *Blackshear v. Interstate Brands Corp.*, 495 F. App'x. 613, 618 (6th Cir. 2012)). TriHealth has thus met its burden of production in proffering legitimate, non-discriminatory reasons that it allegedly terminated Abernathy.[14]

Since TriHealth provided two legitimate, nondiscriminatory reasons for Abernathy's alleged termination, the burden shifts back to her to show, once again by a preponderance of the evidence (which the Court interprets the same as it did above), that the stated reasons were merely pretext designed to mask discrimination.

---

[14] Abernathy argues that TriHealth, in raising insubordination as a legitimate, non-discriminatory reason for terminating her, did not meet its burden. (Doc. 27, #627–28). She reasons that TriHealth improperly categorized ADA-protected activity as insubordination (more on this later). (*Id.*). But when articulating a non-discriminatory reason for adverse employment action, a defendant's burden "is quite low." *Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 WL 3886405, at *4 (6th Cir. June 8, 2023). Indeed, "it is only 'one of production, not persuasion,' and [the Court] make[s] 'no credibility assessment.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Because the Court is satisfied that TriHealth met its burden of production, it will address Abernathy's counterargument under the "pretext" prong. *See id.* at *5 ("[The plaintiff's] arguments to the contrary appear to conflate this determination with whether Defendants' stated reasons were pretextual.").

47

To establish pretext, a plaintiff can show the employer's provided reasons (1) lack a factual basis; (2) did not actually motivate the action; or (3) could not warrant the action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

Unfortunately, Abernathy doesn't attempt to frame her pretext argument within this established framework. The Court, however, understands her sole (and sparse) argument to claim pretext on the first ground. She maintains that TriHealth cannot rely on insubordination as a non-discriminatory reason for its alleged termination decision because her objection to working the Clinic and her request for an accommodation are both protected activities under the ADA. (Doc. 27, #627–28). As a matter of law, then, she says her conduct cannot constitute insubordination. (*Id.*). Or, at the very least, a jury should decide whether she engaged in protected activity or insubordinate conduct. (*See id.*). In other words, she seems to say that because she did not act insubordinately, TriHealth lacked a factual basis to terminate her. The Court will therefore focus its analysis on that first ground.

To show TriHealth had no basis in fact to discharge Abernathy for insubordination—the first ground—she "must produce evidence to show that [s]he was not insubordinate." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015). Admittedly, in analyzing whether Abernathy met her burden, the Court is left in a bit of a quandary. One the one hand, Abernathy seems to have unilaterally provided herself an accommodation by reassigning herself from Clinic duty to triage duty without first obtaining TriHealth's approval. That at least toes the line of insubordination. On the other hand, under Abernathy's telling (which the

Court must accept), at the time Conner allegedly terminated Abernathy, Conner knew that Abernathy's decision not to report to the Clinic arose out of her medical need. Said differently, Conner understood that Abernathy's reassignment decision was not an attempt to flout her responsibilities (i.e., not insubordination), but rather something Abernathy had to do because of her disability.

With all that in mind, the Court concludes that Abernathy has demonstrated a genuine dispute about whether she acted insubordinately. And that's enough for her claim to survive summary judgment. *Id.* at 652 (citation omitted) ("At the summary judgment stage, [the Court] cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged 'insubordination consists of … what a jury could find to be reasonable [ADA]-protected activity.'").

Take the timeline step-by-step. Step one: Abernathy knew, for several weeks, that Conner had scheduled her to work with NP Evans in the Clinic on January 14, 2021. (Doc. 27-1, #640). True, she did not ask for reassignment or seek any accommodation during that time. (*Id.*; *see also* Doc. 19, #195–96). That alone, however, does not amount to insubordination. Step two: On January 14, 2021, Abernathy reported to triage without first speaking to Conner or NP Evans and despite believing that NP Evans had gone to the Clinic. (Doc. 19, #199–200). This is where TriHealth says Abernathy's insubordination began. But Abernathy testified that when she reported to triage, she was "waiting for [Conner] to come downstairs [to triage] because [Abernathy] had paged [Conner]." (*Id.* at #200). A reasonable juror could infer that, at that point, Abernathy wanted to discuss with Conner being

49

excused from Clinic duty, and thus, that Abernathy was attempting to request an accommodation, not that she was acting insubordinately. Indeed, requesting an accommodation is an ADA-protected activity. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422–23 (6th Cir. 2015). Step three: Conner told Abernathy to report to the Clinic, but Abernathy did not go. (Doc. 19, #201; Doc. 21, #433–35). The record indicates that in declining to report to the Clinic, Abernathy explained she could not because of asthma-related concerns. (Doc. 26, #548). Here again, reasonable jurors could view the situation as Abernathy (an employee who Conner knew typically did not work the Clinic) asking for a schedule modification (one that reflected her usual non-Clinic duties) because of her asthma (which Abernathy says Conner knew was a disability), but that Conner nonetheless terminated Abernathy in response.

Taken together, there are competing accounts about precisely how the events on January 14, 2021, unfolded and about whether Abernathy's conduct amounted to insubordination or ADA-protected activity. So the Court cannot conclude, at this stage, that Abernathy's conduct was in fact insubordinate. Thus, a genuine dispute remains as to whether TriHealth's insubordination rationale was merely pretext.

One thing does bear mentioning, though. The ADA does not give employees carte blanche to unilaterally impose their own preferred accommodations at work. *McDonald v. Ford Motor Co.*, 208 F. Supp. 2d 837, 843 (N.D. Ohio 2002). Rather, employers get to decide among effective accommodations. *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998). And the ADA likewise does not require employers to make "on-the-spot accommodations of the employee's choosing."

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018). Those limitations, however, do not carry the day here because it is not clear, based on the record the Court has before it, whether Abernathy's decision to report to triage was (a) her unilaterally imposing an accommodation, or (b) her taking an affirmative step toward asking Conner to provide an accommodation. That is especially so given that Conner did not terminate Abernathy on the spot after learning she reassigned herself to triage; rather, Conner allegedly terminated Conner only after Abernathy apparently requested an accommodation in the form of reassignment from Clinic duty.

Finally, a word on TriHealth's Covid Policy. That Policy specified that TriHealth may ask team members to work in new areas or locations and perform non-routine tasks. (Doc. 22-1, #467). It also laid out expectations that all team members "complete their assigned roles" and clarified that any work duty assigned under the policy was "mandatory." (*Id.*). Most importantly, the Covid Policy specified that team members who failed to report for one shift would receive a Document of Discussion and those who failed to report for two shifts would be considered as having voluntarily resigned. (*Id.* at #468). And it instructed team members with "a medical need for exemption" to "contact the leader and Human Resources Benefits Team/HRBP for assistance." (*Id.*).

TriHealth's problem in relying on the Covid Policy as a legitimate reason to terminate Abernathy is that, at least so far as the Court can tell, she failed to report to only *one* shift. But the Policy clarifies that TriHealth would not consider employees

to have abandoned their jobs or voluntarily resigned until they failed to report to a *second* shift. So a reasonable juror could infer that TriHealth's reliance on the Policy was merely pretext to terminate her for something other than her single failure to report to the Clinic.

In fairness to TriHealth, Abernathy seemingly violated the Covid Policy when she did not report to her "mandatory" work assignment. But that only goes so far. And as relevant here, it does not explain how her single failure to report to the Clinic would have given TriHealth reason to terminate her under the Policy's terms.

All told, a genuine dispute remains over whether TriHealth's rationales for terminating Abernathy amount to pretext.

### b.   Retaliation for Filing an Unemployment Benefits Claim

The Court now turns to Abernathy's second retaliation argument—the one based on TriHealth's apparent attempt to interfere with her collecting employment benefits. TriHealth again argues that Abernathy abandoned this line of argument. (Doc. 33, #830). And while she seemingly did, the Court still must discharge its duty to review the record and determine whether a genuine dispute of material fact exists. *Kaivac*, 2022 WL 7483134, at *2.

The inquiry begins and ends at Abernathy's prima facie showing because she fails on elements one and three. As to element one, the ADA only protects individuals who engage in activity covered by the statute; it does not create a cause of action for any form of workplace retaliation. *Rorrer*, 743 F.3d at 1046. "Protected activity," moreover, refers to action an employee takes to "protest or oppose a statutorily

prohibited discrimination." *Id.* (quotation omitted). Filing for unemployment benefits falls outside that line. *See id.* (citing *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012)); *see also Powell v. Honda of Am. Mfg., Inc.*, No. 2:06-cv-979, 2008 WL 2872273, at *2 (S.D. Ohio July 22, 2008) ("[A] former employer's opposition to a request for unemployment benefits is not, as a matter of law, actionable retaliatory misconduct.").

Moving to element three, TriHealth's mere opposition to Abernathy's request for unemployment benefits does not amount to an adverse employment action. *Ellis v. Prospect Airport Servs.*, No. 17-13852, 2019 WL 2218819, at *4 (E.D. Mich. Jan. 25, 2019), *report and recommendation adopted*, No. 17-13852, 2019 WL 1417163 (E.D. Mich. Mar. 29, 2019) (collecting cases). In sum, Abernathy failed to meet her burden of proving a prima facie case of retaliation for TriHealth's alleged interference with her collecting unemployment benefits. And her failure to develop this line of argument bolsters the Court's determination. *See Peters v. Metro. Gov't of Nashville & Davidson Cnty.*, __ F. Supp. 3d __, 2024 WL 3826358, at *11 (M.D. Tenn. 2024).

Because a genuine dispute remains as to whether TriHealth's insubordination argument was pretext for discrimination, the Court **DENIES** TriHealth's motion for summary judgment as to Abernathy's first retaliation argument. But because Abernathy failed to establish a prima facie case on her second retaliation argument, the Court **GRANTS** TriHealth's motion for summary judgment as to that portion of the claim.

<strong>CONCLUSION</strong>[15]

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** TriHealth's Motion to Strike (Doc. 32). Further, the Court **GRANTS IN PART** TriHealth's Motion for Summary Judgment (Doc. 23) as to the Disability Discrimination claim (Count I), Disability Discrimination Based on Association claim (Count II), and the Retaliation claim (Count IV) to the extent it argues retaliation based on filing unemployment benefits. But the Court **DENIES IN PART** TriHealth's Motion for Summary Judgment (Doc. 23) as to the Failure to Accommodate claim (Count III), and the Retaliation claim (Count IV) to the extent it argues retaliation based on requesting an accommodation.

 **SO ORDERED.**

March 4, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[15] While it may seem surprising that the Court grants TriHealth summary judgment on some of Abernathy's claims, like the ADA disability claim, while simultaneously denying it on related claims, such as the failure to accommodate claim, the Court's differing decisions largely derive from the different frameworks the Court must apply to those claims. Indeed, the Sixth Circuit has made clear that the "distinction between when to apply the direct versus the indirect evidence test is vital because the framework for analyzing the two kinds of cases differs." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (cleaned up); *see also Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514, 516–17 (6th Cir. 2015) (applying the direct evidence test to the plaintiff's failure to accommodate claim and the indirect evidence test to the disability discrimination claim). In other words, the Sixth Circuit implicitly acknowledges that the framework the Court applies impacts the outcome of a claim. So given the different frameworks and elements at play in each of Abernathy's various ADA-related claims, it makes sense that she could move forward on some and not others. *See, e.g., Equal Emp. Opportunity Comm'n v. Clarksville Health Sys., G.P.*, 617 F. Supp. 3d 844, 869 (M.D. Tenn. 2022) (granting summary judgment on the plaintiff's disability discrimination claim and denying summary judgment in part on the failure to accommodate claim).